## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CENTER FOR BIOLOGICAL DIVERSITY,
378 N. Main Avenue
Tucson, AZ 85701;

NORTHEASTERN MINNESOTANS FOR
WILDERNESS,
P.O. Box 625
Ely, MN 55731;

THE WILDERNESS SOCIETY,
1615 M Street, NW
Washington, D.C. 20036,

       Plaintiffs,

v.

MITCHELL LEVERETTE, in his official
capacity as the State Director of the U.S.
Bureau of Land Management's Eastern States
Office,
20 M Street SE, Suite 950
Washington, D.C. 20003;

U.S. BUREAU OF LAND MANAGEMENT,
1849 C Street NW, Rm. 5665
Washington, D.C. 20240;

U.S. FISH AND WILDLIFE SERVICE,
1849 C Street NW
Washington, D.C. 20240;

U.S. FOREST SERVICE,
1400 Independence Ave., SW
Washington, D.C. 20250,

       Defendants.

Case No.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

**INTRODUCTION**

1.      Plaintiffs Center for Biological Diversity, Northeastern Minnesotans for Wilderness, and The Wilderness Society (collectively, "Plaintiffs") challenge the failure of Defendants United States Bureau of Land Management ("BLM"), United States Fish and Wildlife Service ("FWS") and United States Forest Service ("Forest Service") to comply with the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4331, *et seq*., the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531 *et seq*., the BLM's regulations, 43 C.F.R. § 3505, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 *et seq*., concerning federal hardrock minerals prospecting permits held by Twin Metals Minnesota, LCC ("Twin Metals"), on the Superior National Forest in northeastern Minnesota.

2.      Plaintiffs challenge the BLM's failure to comply with NEPA, Section 7 of the ESA, and the agency's regulations in issuing the May 1, 2020 Decision to approve the four-year extension of the following Twin Metals' prospecting permits on the Superior National Forest: MNES054387, MNES054050, MNES054194, MNES054195, MNES054196, MNES053731, MNES055301, MNES055302, MNES055305, MNES053868, MNES054037, MNES055203, and MNES055206.  To the extent that the BLM's May 1, 2020 Decision relies on the BLM's March 13, 2015 "Determination of NEPA Adequacy" Worksheet for Twin Metals' Prospecting Permit Extension Request (NEPA No. DOI-BLM-ES-0030-2015-0004-DNA), Plaintiffs also challenge the 2015 Determination of NEPA Adequacy.

3.      Plaintiffs further challenge the ongoing failure of the BLM, Forest Service, and FWS to reinitiate and complete consultation pursuant to Section 7 of the ESA concerning the ongoing impacts of federal hardrock minerals prospecting permits on the Superior National Forest on threatened and endangered species and their critical habitat.

4.      The 13 prospecting permits that were extended by the BLM are just one component of Twin Metals' overarching and decades-long quest to construct a large-scale copper-nickel mine on the Superior National Forest in northeastern Minnesota, just upstream from and within the same watershed as the Boundary Waters Canoe Area Wilderness.

5.      In addition to these 13 prospecting permits, Twin Metals also holds two federal mineral leases in this same region of the Superior National Forest.  In 2019, the BLM renewed these two mineral leases,[1] and this decision is currently being challenged in this Court.  *The Wilderness Society, et al. v Bernhardt, et al.*, Case No. 20-1176 (BAH).  According to BLM documents, Twin Metals has also applied for two additional preference right leases, as well as additional new prospecting permits, all in this same region of the Superior National Forest.

6.      In December, 2019, Twin Metals submitted to the BLM a proposed Mine Plan of Operations for its desired copper-nickel mine ("Mine").[2]  On June 30, 2020, the BLM published a notice of intent to prepare an Environmental Impact Statement on the Mine proposal, and one of Twin Metals' preference right lease applications, pursuant to NEPA.  85 Fed. Reg. 39,206.[3] The Minnesota Department of Natural Resources will similarly soon commence with the state environmental review process for Twin Metals' Mine proposal.[4]

---

[1] Dep't of Interior, BLM, *BLM Renews Hardrock Mineral Leases in the Superior Nat'l Forest*, (May 15, 2019), https://www.blm.gov/press-release/blm-renews-hardrock-mineral-leases-superior-national-forest-0.
[2] Twin Metals Minn., Mine Plan of Operations, Twin Metals Minn. Project Envtl. Review Support Document (Dec. 18, 2019), http://www.twin-metals.com/wp-content/uploads/2019/12/TMM-Mine-Plan-of-Operations_2019-1218-R.pdf.
[3] Dep't of Interior, *BLM, Non-Ferrous Mine and Preference Right Lease in Superior Nat'l Forest* (last updated May 22, 2020) https://eplanning.blm.gov/eplanning-ui/project/1503233/510.
[4] Minn. Dep't of Natural Resources, *DNR Receives Mining Proposal from Twin Metals Minn.*, (Dec. 18, 2019) https://www.dnr.state.mn.us/news/2019/12/18/dnr-receives-mining-proposal-twin-metals-minnesota.

7.      Plaintiffs prepared the following map of most of Twin Metals mining-related projects and proposals on the Superior National Forest, based on the information currently available to Plaintiffs, and using the BLM's data and information.



8.      Even though all of these mining-related projects and proposals of Twin Metals are under consideration at the same time, and in the same region, the BLM approved the extension of the 13 prospecting permits without any consideration of their relationship to the other Twin Metals projects and proposals, including no consideration of the overall cumulative impacts. The BLM's failure to consider such fundamental, relevant factors concerning these prospecting permits prior to issuing its May 1, 2020 Decision to extend these permits violates NEPA and constitutes arbitrary and capricious agency decisionmaking.

9.    The BLM further failed to consider additional relevant information prior to issuing its May 1, 2020 Decision, including the Forest Service's determination in 2016 that a copper-nickel sulfide mine within the same watershed as the Boundary Waters Canoe Area Wilderness would present an unacceptable risk due to the potential for serious and irreparable harm to this unique, iconic, and irreplaceable wilderness area.

10.    Twin Metals' proposed sulfide copper-nickel mine, along with the company's related mineral exploration in this same area, just upstream of the world-renowned Boundary Waters Canoe Area Wilderness, is highly controversial due to the potential for serious and irreparable harm, as demonstrated by the Forest Service's 2017 application to withdraw this watershed from entry under the mining laws.  82 Fed. Reg. 4,282 (Jan. 13, 2017).  However, the BLM approved the extension of Twin Metals prospecting permits without preparing an Environmental Impact Statement ("EIS") pursuant to NEPA.  In fact, the BLM failed to even prepare an Environmental Assessment ("EA"), in order to determine whether an EIS is required, prior to issuing its May 1, 2020 Decision to extend the permits.

11.    The BLM also failed to consult with FWS over the potential impacts of the proposed action on the federally threatened Canada lynx, gray wolf, northern long-eared bat, and their critical habitat, as required by Section 7 of the ESA, prior to issuing the May 1, 2020 Decision.  Additionally, the BLM, Forest Service, and FWS have failed to reinitiate and complete ESA consultation for federal hardrock minerals prospecting permits on the Superior National Forest even though the gray wolf and northern long-eared bat were not considered in the agencies' prior consultation, in 2012, since they were not listed as threatened at that time.

12.    Plaintiffs seek (1) declaratory relief that the BLM violated NEPA, the ESA, and the agency's regulations in issuing the May 1, 2020 Decision, and vacatur of the May 1, 2020

Decision; (2) declaratory relief that the BLM, Forest Service, and FWS are in ongoing violation of the ESA for failing to reinitiate ESA consultation concerning the ongoing impacts of federal hardrock minerals prospecting permits on the Superior National Forest, and an order compelling the agencies to reinitiate and complete ESA consultation; and (3) injunctive relief to enjoin any exploratory drilling, land clearing, road work, or other ground disturbing activities on Twin Metals' prospecting permits pending full compliance with the law.

## JURISDICTION

13.    Jurisdiction is proper in this Court under 28 U.S.C. § 1331; 28 U.S.C. § 1346; 5 U.S.C. §§ 551 *et seq*., and 16 U.S.C. § 1540(g) because this action involves the United States as a defendant and arises under the laws of the United States, including NEPA, 42 U.S.C. §§ 4331 *et seq*.; the ESA, 16 U.S.C. §§ 1531 *et seq*., the BLM's regulations, 43 C.F.R. subpart 3505; and the APA, 5 U.S.C. §§ 551 *et seq*.  On May 20, 2020, Plaintiffs provided Defendants with notice of Plaintiffs' intent to file suit pursuant to the ESA citizen suit provision. 16 U.S.C. § 1540(g)(2). Plaintiffs filed an administrative appeal with the U.S. Department of Interior Office of Hearings and Appeals, Interior Board of Land Appeals ("IBLA") on May 27, 2020, requesting a stay pending the resolution of their appeal, and the IBLA denied Plaintiffs' request for a stay on July 15, 2020.  An actual justiciable controversy exists between Plaintiffs and Defendants.  The requested relief is proper under 28 U.S.C. §§ 2201 & 2202; 5 U.S.C. §§ 705 & 706; and 16 U.S.C. § 1540(g).  The challenged agency action is final and subject to this Court's review under 5 U.S.C. §§ 702, 704, and 706.

## VENUE

14.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) and 16 U.S.C. § 1540(g)(3)(A), because Defendants all reside in the District of Columbia, Plaintiff The

Wilderness Society resides in the District of Columbia, and the challenged May 1, 2020 Decision was signed by the Acting State Director of the BLM's Eastern States Office, which is located in the District of Columbia.

## PARTIES

15.     Plaintiff Center for Biological Diversity ("the Center") is a non-profit organization with over 75,000 members.  The Center is headquartered in Tucson, Arizona, and has offices across the United States, including Duluth, Minnesota and Washington, D.C.  The Center works to ensure the long-term health and viability of animal and plant species across the United States and elsewhere, and to protect the habitat these species need in order to survive. The Center believes that the health and vigor of human societies and the integrity and wildness of the natural environment are closely linked.  The Center has long advocated for northeastern Minnesota's animal and plant species in administrative processes and in court, including by commenting on mining-related proposals, petitioning for ESA protections for Minnesota's moose population, and joining litigation over proposed mining that would destroy critical habitat for Canada lynx and gray wolves on the Superior National Forest.

16.     Plaintiff Northeastern Minnesotans for Wilderness ("NMW") is a non-profit, tax-exempt, charitable corporation organized under the laws of Minnesota.  Formed in 1996 and based in Ely, Minnesota, NMW's mission is to protect and preserve wilderness and wild places in Minnesota's Arrowhead region, to advocate for the protection of the Boundary Waters and Voyageurs National Park and the enhancement of their wilderness aspect, and to foster education about the value of wilderness and wild places.  NMW was formed to continue the local tradition of working to protect wild paces, particularly the Boundary Waters, against increasing commercial pressures, so that the area's natural features and processes remain intact for future

7

generations.  NMW has approximately 23,500 members, all of whom have contributed

financially, and more than 185,000 additional supporters across all 50 states.  NMW's members

rely on, appreciate, and benefit from the natural resources in the Superior National Forest,

especially the waters, lands, plant communities, and wildlife in the Boundary Waters, as well as

in Voyageurs National Park.  They have a long-standing interest in lynx, moose, wolf, and forest

conservation, both in the Boundary Waters and across the Superior National Forest.

17.     Plaintiff The Wilderness Society, founded in 1935, is a national, non-profit

membership organization headquartered in Washington, D.C., devoted to protecting wilderness

and inspiring Americans to care for wild places.  It has led the effort to permanently protect 111

million acres of wilderness and ensure sound management of our shared national lands.  The

Wilderness Society has more than 1 million members and supporters, including over 2,600

members and 7,200 supporters in Minnesota, and has long worked to protect the Boundary

Waters.  A member of the Campaign to Save the Boundary Waters, The Wilderness Society has

advocated for permanent protection of the Boundary Waters watershed from the threat of sulfide-

ore copper mining, and has worked to inform the public about threats to the Boundary Waters,

including with its 2017 report "Too Wild to Drill."

18.     Plaintiffs bring this action on their own behalf, and on behalf of their members.

Each of the Plaintiff organizations has members who regularly use and enjoy the Superior

National Forest and the Boundary Waters Canoe Area Wilderness for a variety of purposes,

including canoeing, wildlife viewing, hiking, camping, fishing, photographing scenery and

wildlife, and engaging in other vocational, scientific, and recreational activities.  This includes

specific areas that are covered by the prospecting permits at issue in this case, as well as

additional adjacent, nearby, and downstream areas.  Plaintiffs' members use and enjoyment of

this region is enhanced by observing or hearing gray wolves, by viewing or observing signs of Canada lynx, by viewing northern long-eared bats, and by knowing that these species that are threatened with extinction are still present on the Superior National Forest.

19.     Plaintiffs' members regularly use and enjoy the Superior National Forest and Boundary Waters Canoe Area Wilderness in large part due to the quiet, remoteness, and largely unspoiled nature of the landscape, including specific areas that are covered by the prospecting permits and additional areas that are adjacent, nearby, and downstream of the permits.  Plaintiffs' members intend to continue to regularly and frequently use and enjoy these areas, including specific and concrete plans to visit these specific areas this summer, fall, and winter.

20.     Plaintiffs' members also include business owners, including local resort owners, canoe outfitters, and dogsled outfitters, who have been negatively impacted by past mineral exploration by Twin Metals and would again be harmed by additional mineral exploration as authorized by the BLM's extension of these prospecting permits.  Plaintiffs' members further include home and cabin owners in the immediate area, who also have been negatively impacted by past mineral exploration by Twin Metals and would again be harmed by additional mineral exploration as authorized by the BLM's extension of these prospecting permits.

21.     Plaintiffs' members' interests are imminently harmed by the BLM's May 1, 2020 Decision to extend Twin Metals' prospecting permits, without any NEPA review or ESA consultation, as well as by the failure of the BLM, Forest Service, and FWS to reinitiate and complete ESA consultation on the federal hardrock minerals prospecting permits on the Superior National Forest.  Plaintiffs' members have been harmed in the past during their use and enjoyment of the Superior National Forest by the long-term, intermittent to near constant noise of exploratory drilling, increased traffic, road work, fragmentation and impacts to wildlife

habitat, and other industrial activities associated with mineral exploration in this same region. This harm and these negative impacts may resume at any time now that the BLM has extended these numerous prospecting permits, and the IBLA has denied Plaintiffs' request for a stay. These industrial activities and their adverse impacts on the environment interfere with Plaintiffs' members' use and enjoyment of the specific areas of the Superior National Forest within the prospecting permits, and surrounding lands where industrial noises could be heard and other activities observed.

22.     Due to the extension of these prospecting permits, Plaintiffs' members may now need to cancel plans and no longer visit the specific areas of the Superior National Forest and Boundary Waters where they planned to visit this summer, fall, and winter, due to the potential for noise and other industrial activities associated with mineral exploration.

23.     Plaintiffs and Plaintiffs' members also have a substantial interest in ensuring that the BLM, Forest Service, and FWS comply with federal law, including the procedural requirements of NEPA and Section 7 of the ESA, prior to issuing a decision concerning the proposed extension of these prospecting permits.

24.     Plaintiffs' and Plaintiffs' members' injuries are actual, imminent, and concrete, caused by the BLM's May 1, 2020 Decision, and by the failure of the BLM, FWS, and the Forest Service to reinitiate consultation on the federal hardrock minerals prospecting permits on the Superior National Forest, and would be remedied by the relief sought in this case.

25.     Defendant Mitchell Leverette is sued in his official capacity as the State Director of the BLM's Eastern States Office, which is located in Washington, D.C.

26.     Defendant U.S. Bureau of Land Management ("BLM") is an agency of the U.S. Department of the Interior authorized to allow mining on the land covered by the prospecting

10

permits if it is in the best interests of the United States, in compliance with NEPA and the ESA

and other laws and regulations, and with the consent of the U.S. Secretary of Agriculture.

27.     Defendant U.S. Fish and Wildlife Service ("FWS") is an agency within the U.S.

Department of the Interior.  It and its officers are responsible for administering the ESA,

particularly regarding potential impacts to terrestrial wildlife species that have been listed as

threatened or endangered with extinction pursuant to the ESA, including the northern long-eared

bat, gray wolf, and Canada lynx.

28.     Defendant U.S. Forest Service ("Forest Service") is an agency within the U.S.

Department of Agriculture.  It and its officers are responsible for the management of the surface

estate on the Superior National Forest and must consent to the issuance of mining related permits

on these lands.

**LEGAL BACKGROUND**

I.     **Mining Law on the Superior National Forest**

29.     The General Mining Act of 1872, which governs hardrock mining and mineral

leasing in most of the country, does not apply in Minnesota.  *See* 30 U.S.C. § 48.  The BLM may

only authorize hardrock mineral exploration and development on the Superior National Forest

with the consent of the Forest Service.

30.     The Superior National Forest lands at issue in this case are primarily public

domain lands, for which the governing statute authorizes the BLM to permit the prospecting for

and development of mineral resources provided that the Forest Service consents.  16 U.S.C. §

508b.  For acquired lands on the Superior National Forest, the BLM similarly manages the

mineral resources, and must obtain the consent of the Forest Service.  16 U.S.C. § 520;

Reorganization Plan No. 3 § 402, 60 Stat. 1099.  Additionally, any development must not

11

interfere with the primary purposes for which the lands were acquired and only in accordance with such conditions as may be specified by the Forest Service to protect such purposes.  *Id*.

31.     "Prospecting permits" allow the exploration for leasable mineral deposits on lands where the BLM has determined that prospecting is needed to determine the existence of a valuable mineral deposit.  43 C.F.R. § 3501.10(a).  A prospecting permit gives the permittee the exclusive right to prospect on and explore lands available for leasing to determine if a valuable deposit exists.  43 C.F.R. § 3505.10(a).

32.     A prospecting permit is effective for an initial term of two years.  43 C.F.R. § 3505.60.  The BLM may extend prospecting permits for hardrock minerals for up to an additional four years.  43 C.F.R. § 3505.61.

33.     In order for the BLM to extend a prospecting permit, the permittee must provide evidence that (a) it explored with reasonable diligence and was unable to determine the existence and workability of a valuable deposit covered by a permit, or (2) the operator's failure to perform diligent prospecting activities was due to conditions beyond their control.  43 C.F.R. § 3505.62.  "Reasonable diligence means that, in BLM's opinion, you drilled a sufficient number of holes or performed other comparable prospecting to explore the permit area within the time allowed."  *Id*.

34.     A "preference right lease" may be issued by the BLM to holders of prospecting permits who, during the term of the permit, demonstrate the discovery of a valuable deposit of the leasable mineral for which BLM issued the permit.  43 C.F.R. § 3501.10(c).  In order to obtain a preference right lease, the proposed lessee must have a prospecting permit for the area of the proposed lease.  43 C.F.R. § 3507.11.

35.     Before conducting any operations under any lease or permit, the operator must submit an exploration or mining plan, which must show in detail the proposed exploration,

prospecting, testing, development or mining operations to be conducted.  43 C.F.R. § 3592.1(a).

No operations may be conducted except as provided for in an approved plan.  *Id*.

36.     Twin Metals may hold a maximum of 20,480 acres in permits and leases within

the state of Minnesota.  43 C.F.R. § 3503.37.  "Acquired lands" and "public lands" are counted

separately.  43 C.F.R. § 3503.38.

## II.    National Environmental Policy Act

37.     "The National Environmental Policy Act (NEPA) is our national charter for

protection of the environment."  40 C.F.R. § 1500.1(a).  NEPA requires agencies to evaluate and

publicly disclose the potential environmental impacts of proposed actions.  *Marsh v. Or. Natural*

*Res. Council*, 490 U.S. 360, 371 (1989).

38.     NEPA ensures "that the agency, in reaching its decision, will have available, and

will carefully consider, detailed information concerning significant environmental impacts; it

also guarantees that the relevant information will be made available to the [public] that may also

play a role in both the decisionmaking process and the implementation of that decision."

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).

39.     The Council on Environmental Quality ("CEQ") has promulgated NEPA

regulations, and all federal agencies must comply with these regulations.  40 C.F.R. § 1507.1.[5]

---

[5] On July 16, 2020, CEQ issued a new rule to revise the NEPA regulations, which is currently
scheduled to take effect on September 14, 2020.  85 Fed. Reg. 43,304 (July 16, 2020).  The
reviewing court is to look to the regulations that were in place at the time of the challenged
decision, which in this case is May 1, 2020.  *Noble Energy, Inc. v. Salazar*, 691 F. Supp. 2d 14,
17 n. 1 (D.D.C., 2010) ("All references to regulations are to the regulations in effect at the time
of the agency's decision to exclude the leases at issue in this lawsuit."); *Texas v. EPA*, 829 F.3d
405, 430 (5th Cir. 2016) ("Agency actions must be assessed according to the statutes and
regulations in effect at the time of the relevant activity.").

40.    NEPA requires that federal agencies consider "any adverse environmental effects" of their "major . . . actions." *Mid States Coalition for Progress v. Surface Transportation Board*, 345 F.3d 520, 549 (8th Cir. 2003), citing 42 U.S.C. § 4332(C).  "Effects" include both "direct effects" and "indirect effects."  *Id*., citing 40 C.F.R. § 1508.8.  Indirect effects are those that "are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable."  40 C.F.R. § 1508.7.

41.    NEPA requires the consideration of cumulative impacts.  *Grand Canyon Trust v. FAA*, 290 F.3d 339, 341-43 (D.C. Cir. 2002); 40 C.F.R. §§ 1508.25(a)(2), 1508.7.  "Cumulative impact" is defined as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions."  40 C.F.R. § 1508.7.  "Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time."  *Id*.

42.    A cumulative impacts analysis must identify (1) the area in which the effects of the proposed project will be felt; (2) the impacts that are expected in that area from the proposed project; (3) other past, present, and reasonably foreseeable actions that have had or are expected to have impacts in the same area; (4) the impacts or expected impacts from these other actions; and (5) the overall impact that can be expected if the individual impacts are allowed to accumulate.  *Del. Riverkeeper Network v. FERC*, 753 F.3d 1304, 1319 (D.C. Cir. 2014).

43.    Agencies must consider connected, cumulative, and similar actions together in a single EIS.  40 C.F.R. § 1508.25.

44.    Proposals for related actions that will have cumulative or synergistic environmental impacts upon a region and are concurrently pending before an agency must be

14

considered together, as only through the comprehensive consideration of pending proposals can the agency evaluate the different courses of action. *Kleppe v. Sierra Club*, 427 U.S. 390, 410 (1976).

45.     Connected actions are those actions that are closely related and therefore must be analyzed in the same EIS. 40 C.F.R. § 1508.25(a)(1). Actions are considered connected if they automatically trigger other actions that may require environmental impact statements, cannot or will not proceed unless other actions are taken previously or simultaneously, or are interdependent parts of a larger action and depend on the larger action for their justification. *Id*.

46.     NEPA requires agencies to prepare a detailed "environmental impact statement" ("EIS") for major federal actions that may significantly impact the environment. 42 U.S.C. § 4332(2)(C). Agencies may prepare an "Environmental Assessment" ("EA") when necessary to determine whether a proposed action may have a significant impact on the environment. 40 C.F.R. §§ 1501.3, 1508.9. Based on the EA, the agency must determine whether an EIS is required. 40 C.F.R. § 1501.4(c).

47.     If the EA demonstrates that the proposed action may result in significant effects to the environment, the agency must prepare an EIS. *Am. Rivers & Ala. Rivers Alliance v. FERC*, 895 F.3d 32, 38 (D.C. Cir. 2018); *Sierra Club v. Peterson*, 717 F.2d 1409, 1415 (D.C. Cir. 1983).

48.     To decide whether a proposed action may have significant impacts on the environment, agencies must consider the "intensity" and "context" of the action. 40 C.F.R. § 1508.27. "Context" refers to the geographic and temporal scope of the proposed action and interests that would be affected. 40 C.F.R. § 1508.27(a). "Intensity" refers to the severity of the environmental impacts and includes consideration of "other actions with individually insignificant but cumulatively significant effects," controversial actions, actions with unknown

risks, the proximity of the proposed action to ecologically critical areas, and the potential effects

on threatened and endangered species.  40 C.F.R. § 1508.27(b).

49.     If the agency decides based on the EA that it does not need to prepare an EIS, it

must prepare a "Finding of No Significant Impact," and make this finding available to the public.

40 C.F.R. § 1501.4(e).

50.     Certain actions may be categorically excluded from NEPA review.  The NEPA

regulations define "categorical exclusions" as "actions which do not individually or cumulatively

have a significant effect on the human environment."  40 C.F.R. § 1508.4.  Agencies are directed

to develop a list of activities that meet this definition.  40 C.F.R. § 1507.3(b)(2)(ii).  A

categorically excluded activity may nonetheless require full NEPA analysis if there are

"extraordinary circumstances."  40 C.F.R. § 1508.4.

51.     Agency must make diligent efforts to involve the public in preparing and

implementing their NEPA procedures.  40 C.F.R. § 1506.6(a).  "NEPA procedures must insure

that environmental information is available to public officials and citizens before decisions are

made and before actions are taken."  40 C.F.R. § 1500.1(b).

52.     The information in a NEPA analysis must be of high quality, as accurate scientific

analysis, expert agency comments, and public scrutiny are essential to implementing NEPA.  40

C.F.R. § 1500.1(b).

53.     NEPA imposes a continuing duty on agencies to supplement previous

environmental analyses.  *Price Road Neighborhood Ass'n v. U.S. Dept. of Transp.*, 113 F.3d

1505, 1509 (9th Cir. 1997).  Agencies must prepare a supplemental EIS if the agency makes

substantial changes to the action that are relevant to environmental concerns, or there are

significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts.  40 C.F.R. § 1502.9(c).

## III.    Endangered Species Act

54.    Congress enacted the ESA to provide a program for the conservation of threatened and endangered species.  16 U.S.C. § 1531(b).  All federal agencies must seek to conserve threatened and endangered species, and shall utilize their authorities in furtherance of the purposes of the ESA.  16 U.S.C. § 1531(c)(1).

55.    The ESA defines "conservation" to mean "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this Act are no longer necessary."  16 U.S.C. § 1532(3).

56.    Section 4 of the ESA directs the Secretary of the Interior to list species that are threatened or endangered with extinction, and to designate "critical habitat" for such species.  16 U.S.C. § 1533(a).  "Critical habitat" is the area that contains the physical or biological features essential to the "conservation" of the species and which may require special protection or management considerations.  16 U.S.C. § 1532(5)(A).

57.    Section 7(a)(2) of the ESA requires each federal agency, in consultation with FWS, to ensure that any action authorized, funded, or carried out by the agency is not likely to jeopardize the continued existence of any threatened or endangered species, or result in the destruction or adverse modification of the critical habitat of such species.  16 U.S.C. § 1536(a)(2).  During consultation, both the action agency and FWS must use the best scientific data available.  *Id.*

58.    Action is defined as "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies in the United States or upon the high seas."

17

50 C.F.R. § 402.02.  Examples include the granting of leases and permits, and actions that would directly or indirectly cause modifications to the land, water, or air.  *Id.*

59.     For each proposed action, the action agency must request from FWS whether any listed or proposed species may be present in the area of the proposed action.  16 U.S.C. § 1536(c)(1); 50 C.F.R. § 402.12(c).  If listed or proposed species may be present, the action agency must prepare a "biological assessment" to determine whether the listed species may be affected by the proposed action.  16 U.S.C. § 1536(c)(1); 50 C.F.R. § 402.12.

60.     If the action agency determines that its proposed action may affect any listed species or critical habitat, the agency must engage in "formal consultation" with FWS.  50 C.F.R. § 402.14(a).  The agency is not required to initiate formal consultation if it determines through informal consultation, with FWS' written concurrence, that the proposed action is "not likely to adversely affect" any listed species or critical habitat.  50 C.F.R. § 402.14(b)(1).

61.     To complete formal consultation, FWS must provide the action agency with a "biological opinion" explaining how the proposed action will affect the listed species or critical habitat.  16 U.S.C. § 1536(b); 50 C.F.R. § 402.14(h).  As part of its formal consultation, FWS must review all relevant information, evaluate the current status of the listed species and critical habitat, evaluate the effects of the action and cumulative effects on listed species and critical habitat, and formulate its biological opinion as to whether the proposed action, taken together with cumulative effects, is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat.  50 C.F.R. § 402.14(g); *Am Rivers & Ala. Rivers Alliance*, 895 F.3d at 45.

62.     If FWS concludes in the biological opinion that the proposed action is likely to jeopardize the continued existence of a listed species, or result in the destruction or adverse

modification of critical habitat, FWS must outline "reasonable and prudent alternatives" to the proposed action that FWS believes would not jeopardize listed species or result in the destruction or adverse modification of critical habitat.  16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(h)(2).

63.     If FWS concludes in the biological opinion that the proposed action is not likely to jeopardize the continued existence of a listed species, or result in the destruction or adverse modification of critical habitat, FWS must provide an "incidental take statement" along with the biological opinion, specifying the amount or extent of such incidental taking on the species, any "reasonable and prudent measures" that FWS considers necessary or appropriate to minimize such impact, and setting forth the "terms and conditions" that must be complied with by the action agency to implement those measures.  16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i).

64.     In order to monitor the impacts of incidental take, the action agency must report the impact of its action on the listed species to FWS.  50 C.F.R. § 402.14(i)(3).  If during the course of the action the amount or extent of incidental taking is exceeded, the action agency and FWS must reinitiate consultation immediately.  50 C.F.R. § 401.14(i)(4); 50 C.F.R. § 402.16.

65.     The reinitiation of formal consultation is required and must be requested by FWS or the action agency where discretionary federal involvement or control over the action has been retained or is authorized by law, and if (1) the amount or extent of taking specified in the incidental take statement is exceeded; (2) new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered; (3) the action is modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion; or (4) a new species is listed or critical habitat designated that may be affected by the identified action.  50 C.F.R. § 402.16(a).

66.     After the initiation or reinitiation of consultation, the action agency is prohibited

from making any irreversible or irretrievable commitment of resources with respect to the action

that may foreclose the formulation or implementation of any reasonable and prudent alternative

measures.  16 U.S.C. § 1536(d).

67.     Section 9 of the ESA and its implementing regulations prohibit the unauthorized

"take" of any endangered or threatened species of fish or wildlife.  16 U.S.C. § 1538(a)(1); 16

U.S.C. § 1533(d); 50 C.F.R. § 17.31.  "Take" is defined broadly to include harming, harassing,

trapping, capturing, wounding or killing a protected species either directly or by degrading its

habitat.  16 U.S.C. § 1532(19).  Taking that is in compliance with the terms and conditions of an

incidental take statement is exempt from the Section 9 take prohibition.  16 U.S.C. § 1536(o)(2).

## IV.     Administrative Procedure Act

68.     Pursuant to the APA, a person suffering legal wrong because of agency action, or

adversely affected or aggrieved by agency action within the meaning of a relevant statute, is

entitled to judicial review thereof.  5 U.S.C. § 702.

69.     Agency action made reviewable by statute and final agency actions for which

there is no adequate remedy in court are subject to judicial review.  5 U.S.C. § 704.

70.     The APA directs a court to compel agency action unlawfully withheld or

unreasonably delayed; and to hold unlawful and set aside agency action found to be arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with the law, or agency action

that is undertaken without observance of procedure required by law.  5 U.S.C. § 706.

## FACTUAL BACKGROUND

I.      **The Federal Hardrock Minerals Prospecting Permits Project**

71.     The authority over the exploration and development of federal hardrock mineral resources on National Forest System lands is shared between the Forest Service and BLM.  The BLM has authority to issue prospecting permits and leases, and to approve operating plans associated with all phases of exploration, development, and the extraction of federal hardrock minerals.  The BLM cannot grant or extend prospecting permits, and cannot grant or renew mineral leases, or authorize certain activities on National Forest System lands without the Forest Service's consent.  The Forest Service is responsible for managing National Forest System lands and has the authority for various uses including roads and facilities.

72.     In 2012, the Forest Service issued a Final Environmental Impact Statement ("FEIS") for the proposed "Federal Hardrock Minerals Prospecting Permits Project" on the Superior National Forest.  The FEIS was prepared to consider and address the applications for 29 federal hardrock minerals prospecting permits located within the Superior National Forest that the BLM had received from a number of mining companies, including Twin Metals.[6]

73.     The Forest Service issued its Record of Decision for the Federal Hardrock Minerals Prospecting Permits Project in May 2012, choosing to implement Alternative 4 from the FEIS.  The decision provided the Forest Service's consent to the BLM issuing 29 prospecting permits, including 37,562 acres of National Forest System lands in the public domain, and 1,142 acres of National Forest Service lands acquired under the Weeks Act, for a total of 38,704 acres.

---

[6]  Twin Metals is owned by Antofagasta PLC of Santiago, Chile.  Twin Metals has acquired many other companies that were operating within the same area of the Superior National Forest, including Duluth Metals and Franconia Minerals, and has a joint-venture relationship with Beaver Bay JV and Lehmann Exploration.

74.     A federal hardrock minerals prospecting permit provides the permittee with the exclusive right to prospect and explore for minerals within the permit area.  Ground disturbing activities cannot occur on a prospecting permit unless the permittee has an approved operating plan in place.  According to the Forest Service, the BLM's decision to approve an operating plan is not a decision subject to NEPA.  2012 FEIS, p. 6.

75.     If exploration activities find valuable mineral deposits, then mineral leasing may be proposed by the mining company.

76.     Operations that may be conducted under a prospecting permit include drill pad clearing, drill pad preparation, drilling, drill pad reclamation, geophysical surveys, geologic mapping, soil and rock chip geochemical surveys, access road construction and reconstruction, and the closure and decommissioning of roads.

77.     The environmental impacts resulting from the approval of the prospecting permits include, but are not limited to, the clearing of lands and construction of drill pads, the noise and other impacts associated with exploratory drilling, the construction of new roads and the reconstruction of existing roads, the clearing of lands and construction of helicopter landing pads, the noise and other impacts associated with helicopter use, the establishment of landings for barges at lake shores, and the increased road use and other impacts associated with the increased presence of workers for these activities.

78.     On July 14, 2012, Plaintiff Center for Biological Diversity and others submitted an administrative appeal of the Forest Service's Record of Decision for the Federal Hardrock Minerals Prospecting Permits Project.  The appellants argued in part that the Forest Service had failed to properly consider the cumulative impacts of other mining related projects in the region.

79.     On August 29, 2012, the Forest Service denied the Center's administrative appeal. In response to the Center's cumulative impacts argument, the Forest Service stated that it was not aware of a submitted plan for the proposed Twin Metals mine, and that it would be speculative to guess the specifics at that time.  According to the Forest Service, "If and when the Twin Metals project or any other mine proposals reach the stage of being considered 'reasonably foreseeable,' the Forest Service would consider cumulative impacts as needed for a project proposal undergoing NEPA analysis."  Aug. 27, 2012 Appeal Recommendation, pp. 8-9.

80.     On March 22, 2012, FWS completed a Biological Opinion for the Hardrock Minerals Prospecting Permits, pursuant to Section 7 of the Endangered Species Act.

81.     FWS considered the impacts of the prospecting permits on the Canada lynx and its critical habitat within the 2012 Biological Opinion.  FWS concluded that the prospecting permits are expected to result in adverse effects to the Canada lynx, but are not likely to adversely affect the designated critical habitat for the lynx.

82.     FWS noted in the 2012 Biological Opinion that the Forest Service had determined that the prospecting permits "may affect and is likely to adversely affect gray wolf."  FWS, however, did not consider the potential impacts of the prospecting permits on the gray wolf or its critical habitat within the 2012 Biological Opinion because the gray wolf and its critical habitat had been removed from the endangered species list at that time.

83.     The 2012 Biological Opinion did not consider or evaluate the potential impacts of the prospecting permits on the northern long-eared bat, as the bat was not listed as a threatened species at the time of the Biological Opinion.

84.     For some of the prospecting permits for which Twin Metals later sought an extension of its permit, mineral exploration was conducted.  For other prospecting permits for

which Twin Metals later sought an extension, it is Plaintiffs' understanding based on BLM and

Forest Service documents and information that is currently available, that Twin Metals did not

conduct mineral exploration activities prior to seeking the extension.

II.    **The BLM's March 13, 2015 Determination of NEPA Adequacy**

85.    On April 25, 2014, Twin Metals requested that the BLM approve the extension of

13 prospecting permits on the Superior National Forest.

86.    On March 13, 2015, the BLM issued a Determination of NEPA Adequacy

Worksheet for "Twin Metals Minnesota, LLC and Duluth Metals, Ltd., Prospecting Permit

Extension Request."  The description of the proposed action was to extend 13 prospecting

permits for a four-year period.  According to the BLM, the proposed action was "a request for

extension to determine the workability of the mineral deposit on the prospecting permit lands for

an existing approved action analyzed within the 2012 [Federal Hardrock Minerals Prospecting

Permit] FEIS."

87.    The BLM determined in the March, 2015 Determination of NEPA Adequacy

Worksheet that "[n]o new issues or concerns have arisen," and that "no new information has

been brought to the attention of BLM from the Superior National Forest in regards to the

prospecting permit extension request."

88.    The BLM did not provide any public notice or seek public comments prior to

issuing the 2015 Determination of NEPA Adequacy.  Because the BLM determined that no

NEPA review or procedures were required, the BLM conducted no public scoping, provided no

public comment period, and made no effort to involve the public.

89.    Upon discovery of the Determination of NEPA Adequacy in March, 2015,

Plaintiff NMW asked BLM whether there would be an opportunity for public comment and

involvement, since the exploration activities covered by permits affects public use of the

Superior National Forest and wilderness users.  The BLM responded that the Determination of

NEPA Adequacy "is an administrative action and consequently does not include additional

public involvement."  March 25, 2015 email from BLM to Ms. Garwin.

### III.    The BLM's May 1, 2020 Decision to Extend the Prospecting Permits

90.    Five years later, on May 1, 2020, the BLM issued its decision, extending 13

prospecting permits held by Twin Metals for 4 years.  The 13 prospecting permits collectively

cover more than 15,000 acres of the Superior National Forest.

91.    According to the May 1, 2020 Decision, the Forest Service raised no objection to

these permit extensions in letters dated December 22, 2014 and March 13, 2015.

92.    According to the Decision, "the prospecting permits are hereby extended to be

effective May 1, 2020.  The permits, which now contain approved exploration plans, are

extended for a period of four years and will expire on April 30, 2024."

93.    The BLM did not provide any public notice or seek public comments, or make

any effort to involve the public, prior to issuing the May 1, 2020 Decision to extend the

prospecting permits.

94.    The BLM did not consult with FWS, pursuant to Section 7 of the ESA, prior to

issuing the May 1, 2020 Decision to extend the prospecting permits.

### IV.    Relevant Information Not Considered by the BLM in the 2015 DNA or the 2020
### Decision

95.    On February 20, 2015, FWS issued a new final rule that reinstated the March 9,

1978 final rule for gray wolves in the western Great Lakes including threatened status for gray

wolves in Minnesota.  80 Fed. Reg. 9,218 (Feb. 20, 2015).

96.     On April 2, 2015, FWS designated the northern long-eared bat as a threatened species under the ESA, including within Minnesota.  80 Fed. Reg. 17,974 (Apr. 2, 2015).

97.     On December 14, 2016, the Forest Service notified the BLM that it would not consent to the renewal of Twin Metals' mineral leases MNES-01352 and MNES-01353 on the Superior National Forest.  Based on its analysis, the Forest Service found "unacceptable the inherent potential risk that development of a regionally-untested copper-nickel sulfide ore mine within the same watershed as the [Boundary Waters Canoe Area Wilderness] might cause serious and irreparable [sic] harm to this unique, iconic, and irreplaceable wilderness area."

98.     The Forest Service has not recanted or withdrawn its December 14, 2016 letter to the BLM, which sets forth in considerable detail why a copper-nickel mine in this watershed, such as the one proposed by Twin Metals, would be unacceptable and cannot be permitted.

99.     On January 13, 2017, the Forest Service requested a twenty-year mineral withdrawal of National Forest System lands within the Rainy River Watershed.  82 Fed. Reg. 4828 (Jan. 13, 2017).  As explained by the Forest Service, the purpose of the withdrawal request is protection of the natural resources and waters located on the National Forest System lands from the potential adverse environmental impacts arising from exploration and development of Federally-owned minerals conducted pursuant to the mineral leasing laws within the Rainy River Watershed that flow into the Boundary Waters Canoe Area Wilderness and the Boundary Waters Canoe Area Wilderness Mining Protection Area in northeastern Minnesota.  82 Fed. Reg. at 4283.

100.     Despite the Forest Service's 2016 decision withholding consent to renewal of the leases and the subsequent application for withdrawal, the BLM reinstated Twin Metals' two

mineral leases in 2018, and renewed the same leases in 2019.  The BLM's reinstatement and renewal of these mineral leases are being challenged in federal court.

101.    According to a November 6, 2018 BLM Information/Briefing Memorandum, the BLM at that time was considering three preference right lease applications, two of which were from Twin Metals and one from Encampment.  According to the same Memorandum, there were 25 new prospecting permit applications pending before the BLM at that time, including 11 from Twin Metals.  The BLM stated that these new prospecting permit applications were not addressed in the 2012 EIS for federal hardrock minerals prospecting permits on the Superior National Forest.  The BLM further stated that it was preparing a "programmatic EA" to consider the three preference right lease applications and the 25 new prospecting permit applications.

102.    On December 18, 2019, Twin Metals submitted to the BLM and other federal and state agencies a Mine Plan of Operations for its proposed Twin Metals Mine Project.  The proposed Mine would be a large-scale copper-nickel mine, which would process 20,000 tons of ore per day.

103.    The site of the proposed Twin Metals Mine is on the Superior National Forest, between Ely and Babbitt, Minnesota.  The site is upstream from and within the same watershed as the Boundary Waters Canoe Area Wilderness.

104.    The mine tailings produced by the Twin Metals Mine would be transported to a tailings site located approximately 350 feet from Birch Lake at its nearest point.

105.    On June 30, 2020, the BLM issued a notice of intent to prepare an EIS to analyze the potential impacts of Twin Metals' proposed Mine Plan of Operations and one of Twin Metals' new preference right lease applications.  85 Fed. Reg. 39,206 (June 30, 2020).  The Forest Service is serving as a cooperating agency in the preparation of the EIS.  *Id.*

V.     **Plaintiffs' Sixty-Day Notice Letter and Administrative Appeal to the IBLA**

106.    In May, 2020, Plaintiffs discovered that the BLM had issued the Decision on May

1, 2020 to extend the Twin Metals prospecting permits.

107.    On May 20, 2020, Plaintiffs provided notice to Defendants concerning the ESA

claims and allegations in this Complaint, pursuant to the ESA citizen suit provision.  16 U.S.C. §

1540(g).

108.    On May 27, 2020, Plaintiffs submitted notice of an administrative appeal to the

Interior Board of Land Appeals ("IBLA"), along with a statement of reasons and a request for a

stay.  On July 15, 2020, the IBLA denied Plaintiffs' request for a stay.

109.    Defendants have not responded to Plaintiffs' sixty-day notice letter.

## CLAIMS FOR RELIEF

**CLAIM 1:     The BLM Violated NEPA by Failing to Consider the Cumulative Impacts of
               the Prospecting Permits Along with All Past, Present, and Reasonably
               Foreseeable Future Actions Prior to Issuing the May 1, 2020 Decision.**

110.    Plaintiffs hereby incorporate by reference all preceding paragraphs.

111.    "In accord with NEPA, [Federal agencies] must 'consider' cumulative impacts."

*Neighbors of Cuddy Mountain v. U.S. Forest Service*, 137 F.3d 1372, 1379 (9th Cir. 1998), citing

40 C.F.R. § 1508.25(c).  The obligation to consider cumulative impacts applies to both EISs and

EAs.  *Sierra Club v. U.S. Army Corps of Engineers*, 645 F.3d 978, 991 (8th Cir. 2011) (stating

that each EA shall include a discussion of the environmental impacts of the proposed action,

including cumulative impacts).

112.    "Cumulative impact is the impact on the environment which results from the

incremental impact of the action when added to other past, present, and reasonably foreseeable

future actions regardless of what agency (Federal or non-Federal) or person undertakes such

28

other actions." 40 C.F.R. § 1508.7. "Reasonably foreseeable" means it is "sufficiently likely to occur that a person of ordinary prudence would take it into account in reaching a decision." *Mid States Coalition for Progress v. Surface Transp. Board*, 345 F.3d 520, 549 (8th Cir. 2003). When the nature of the effect is reasonably foreseeable but its extent is not, the agency still must consider the effect. *Id.*

113.    "Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." 40 C.F.R. § 1508.7. An agency cannot break an action down into small component parts to avoid a significance determination. 40 C.F.R. § 1508.27(b)(7).

114.    Prior to issuing the May 1, 2020 Decision, the BLM failed to consider and disclose the overall cumulative impacts of the proposed action along with all past, present, and reasonably foreseeable future actions within the same region of the Superior National Forest, in violation of NEPA. 40 C.F.R. §§ 1508.25(c), 1508.7, 1508.27(b)(7). The BLM's May 1, 2020 Decision is therefore arbitrary, capricious, an abuse of discretion, contrary to law, and contrary to the procedures required by law, and must be set aside. 5 U.S.C. § 706.

**CLAIM 2:    The BLM Violated NEPA by Failing to Consider Whether the Extension of the Prospecting Permits, and Twin Metals' Mine Plan of Operations, Preference Right Lease Applications, and/or New Permit Applications are Cumulative and/or Connected Actions that Must be Considered Together.**

115.    Plaintiffs hereby incorporate by reference all preceding paragraphs.

116.    Pursuant to the NEPA regulations, the "scope" of a NEPA analysis consists of the range of actions, alternatives, and environmental impacts that must be considered collectively. 40 C.F.R. § 1508.25. In order to determine the proper scope of a NEPA analysis, agencies must consider three types of actions. *Id.* Connected, cumulative, and similar actions must be considered together, in a single EIS. *Id.*

117.    Actions are connected when they cannot proceed unless other actions are taken previously or simultaneously, or are interdependent parts of a larger action and depend on the larger action for their justification.  40 C.F.R. § 1508.25(a)(1).  Actions are cumulative when, viewed with other proposed actions, they have cumulatively significant impacts and should therefore be addressed in the same EIS.  40 C.F.R. § 1508.25(a)(2).

118.    During the same time that the BLM was considering whether to issue the May 1, 2020 Decision extending Twin Metals' prospecting permits, the BLM received from Twin Metals a Mine Plan of Operations, proposing a large-scale copper-nickel mine for this same region.  Twin Metals had also submitted to the BLM two new preference right lease applications for this same region.  And the BLM was also considering during this time a number of new prospecting permit applications submitted by Twin Metals for this same region.

119.    There is no indication in the May 1, 2020 Decision that BLM considered whether or not the proposed extension of the prospecting permits, the proposed Mine Plan of Operations, the proposed preference right leases, and the new prospecting permit applications, all from Twin Metals, all proposed within the same region, and all under consideration at the same time, were cumulative and/or connected actions that must be considered together in a single NEPA analysis.

120.    The extension of the prospecting permits, proposed Mine Plan of Operations, proposed preference right leases, and proposed new prospecting permits, would result in cumulatively significant impacts on the environment.  These proposed actions were therefore required to be considered collectively as cumulative actions, in a single NEPA analysis.  40 C.F.R. § 1508.25(a)(2).

121.    The extension of the prospecting permits, proposed Mine Plan of Operations, proposed preference right leases, and/or proposed new prospecting permits, are connected

actions, which were required to be considered together in a single NEPA analysis.  40 C.F.R. § 1508.25(a)(1).

122.     In failing to consider whether the extension of the prospecting permits may be cumulative and/or connected to the other mine related proposals of Twin Metals in this same region, prior to issuing the May 1, 2020 Decision, the BLM failed to take a hard look at the environmental impacts of the extension of the permits, failed to consider all relevant factors, and violated NEPA.  40 C.F.R. § 1508.25(a).  The BLM's May 1, 2020 Decision is therefore arbitrary, capricious, contrary to law, and contrary to the procedures required by law, and must be set aside.  5 U.S.C. § 706.

**CLAIM 3:**     **The BLM Violated NEPA by Failing to Consider and Address Relevant New Science and Information, Prior to Issuing the May 1, 2020 Decision.**

123.     Plaintiffs hereby incorporate by reference all preceding paragraphs.

124.     Accurate scientific analysis is essential to implementing NEPA, and thus agencies must insure the scientific integrity of their discussions and analyses in NEPA documents.  40 C.F.R. §§ 1500.1(b), 1502.24.

125.     An agency violates NEPA when it relies on stale data and information, and fails to collect or consider new scientific information.  *Am. Rivers & Ala. Rivers Alliance v. FERC*, 895 F.3d at 50; *N. Plains Res. Council v. Surface Transp. Bd.*, 668 F.3d 1067, 1086-87 (9th Cir. 2011).

126.     Agencies must continue to take a hard look at the environmental effects of an action even after it has received initial approval, and therefore have a continuing duty under NEPA to gather and evaluate new information that may alter the results of their original environmental analyses.  *Marsh*, 490 U.S. at 374; *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 557 (9th Cir. 2000).

127.    The BLM relied on the Forest Service's 2012 Federal Hardrock Minerals

Prospecting Permits FEIS within its March 13, 2015 Determination of NEPA Adequacy

Worksheet for the proposed extension of the thirteen prospecting permits.  The BLM then relied

on the 2015 Determination of NEPA Adequacy Worksheet in issuing its May 1, 2020 Decision

to extend the prospecting permits.

128.    It was improper under NEPA for the BLM to simply rely on the 2015

Determination of NEPA Adequacy Worksheet, which itself relied on the 2012 EIS, because that

EIS has become stale and outdated in light of relevant new science and information.  BLM

NEPA Handbook H-1790-1, § 5.1.

129.    There is no indication that the BLM considered the relevant new information and

science concerning the proposed action and related mining activities within this region of the

Superior National Forest prior to issuing its May 1, 2020 Decision.  This includes, but is not

limited to, (1) the determination by the Forest Service in 2016 that a copper-nickel mine in this

same watershed would pose an inherent, unacceptable risk to the Boundary Waters Canoe Area

Wilderness, including all supporting scientific reports and analyses; (2) the Forest Service's

subsequent request for a 20-year mineral withdrawal of National Forest System lands within the

Rainy River Watershed, and the related EA that was prepared to inform the Secretary of the

Interior's decision; (3) the February 20, 2015, issuance of a new final rule by FWS that reinstated

the March 9, 1978 final rule for gray wolves in the western Great Lakes, including threatened

status for gray wolves in Minnesota; (4) the April 2, 2015, designation of the northern long-eared

bat by FWS as a threatened species under the ESA, including within Minnesota; (5) information

provided to the agencies informing them that the noise impacts from the prospecting permits

have been more substantial and controversial than the Forest Service had anticipated in the 2012

32

FEIS for the Federal Hardrock Minerals Prospecting Permits; and (6) the proposed Mine Plan of Operations, preference right lease applications, new prospecting permit applications, and all related documents and information provided by Twin Metals to the BLM and other state and federal agencies in 2017, 2018, 2019, and 2020.

130.    The BLM failed to consider and address relevant new science and information, and all relevant factors, prior to issuing its May 1, 2020 Decision, in violation of NEPA.  The BLM's May 1, 2020 Decision is therefore arbitrary, capricious, contrary to law, and contrary to the procedures required by law, and must be set aside.  5 U.S.C. § 706.

**CLAIM 4:     The BLM Violated NEPA by Failing to Prepare an Environmental Assessment ("EA") or Environmental Impact Statement ("EIS") Prior to Issuing the May 1, 2020 Decision to Extend the Prospecting Permits.**

131.    Plaintiffs hereby incorporate by reference all preceding paragraphs.

132.    Prior to issuing its May 1, 2020 Decision, the BLM was required to prepare and circulate an EIS, in which it evaluated and disclosed the potential impacts of the proposed action, considered alternatives, and identified all irreversible and irretrievable commitments of resources associated with the proposed action.  42 U.S.C. § 4332(2).  Or, in the alternative, the BLM could have prepared an EA to determine whether the proposed project may result in any significant impacts and, therefore, require an EIS.  40 C.F.R. §§ 1501.3, 1501.4(b), 1508.9.

133.    If the EA concluded that the project may have a significant impact on the environment, then an EIS would have been required.  40 C.F.R. § 1508.9.  If not, the BLM would have been required to provide a detailed statement of reasons why the project's impacts are insignificant and issue a "finding of no significant impacts" ("FONSI").  40 C.F.R. §§ 1501.4(c), 1508.13.

134.    In considering whether a proposed project may have a significant impact on the environment, the NEPA regulations require the BLM to consider ten "significance" factors, including the unique characteristics of the geographic area; the degree to which effects on the environment are likely to be controversial, uncertain, or involved unknown risks; whether the action is related to other actions with individually insignificant but cumulatively significant impacts; and the degree to which the action may adversely affect threatened or endangered species.  40 C.F.R. § 1508.27(b).

135.    Prior to issuing the May 1, 2020 Decision, the BLM did not prepare an EIS, or an EA.  The agency instead approved the proposed action with no NEPA review.  In doing so, the BLM failed to consider all relevant factors, including the NEPA significance factors.

136.    Had the agency considered the relevant significance factors, as required by NEPA, the BLM would have found that the proposed action is located in a unique geographic area, just upstream from the unique and irreplaceable Boundary Waters Canoe Area Wilderness. 40 C.F.R. § 1508.27(b)(3).  The BLM would have further found that the potential impacts of the proposed action are controversial and uncertain, and that the proposed action is related to other actions with cumulatively significant impacts including Twin Metal's proposed Mine Plan of Operations and preference right lease applications.  40 C.F.R. § 1508.27(b)(3-6).  And the BLM would have found that the action may adversely affect Canada lynx, gray wolves, and the northern long-eared bat.  40 C.F.R. § 1508.27(b)(9).

137.    In order to evaluate and consider the potential environmental impacts of a proposed action under NEPA, the agency must establish the baseline conditions of the potentially affected resources in the vicinity of the proposed action, such as surface and groundwater, wildlife and wildlife habitat, and wetlands.  40 C.F.R. § 1502.15; *Half Moon Bay Fisherman's*

*Mktg. Ass'n. v. Carlucci*, 857 F.2d 505, 510 (9th Cir. 1988).  The BLM failed to determine,

consider, or establish baseline conditions prior to issuing the May 1, 2020 Decision.

138.    By failing to consider the relevant significance factors and baseline conditions

prior to issuing its May 1, 2020 Decision, the BLM violated NEPA.  40 C.F.R. §§ 1501.4,

1502.15, 1508.4, 1508.27(b).  As a result, the BLM's May 1, 2020 Decision is arbitrary,

capricious, not in accordance with law, and not in accordance with procedures required by law.

5 U.S.C. § 706.

**CLAIM 5:     The BLM Violated the ESA by Failing to Consult with FWS, and Ensure No**
**Jeopardy to Listed Species and No Adverse Modification or Destruction of**
**Critical Habitat, Prior to Issuing the May 1, 2020 Decision.**

139.    Plaintiffs hereby incorporate by reference all preceding paragraphs.

140.    The BLM's May 1, 2020 Decision constitutes an agency action under the ESA

which may affect listed species, including the Canada lynx and its critical habitat, the gray wolf

and its critical habitat, and the northern-long eared bat.

141.    Prior to issuing the May 1, 2020 Decision, the BLM failed to request from FWS

whether any listed species may be present in the area of the proposed action, in violation of the

ESA.  16 U.S.C. § 1536(c)(1); 50 C.F.R. § 402.12.  Listed species may be present in the area of

the prospecting permits, and therefore the BLM's failure to prepare a "biological assessment" to

determine whether the species may be affected by the extension of the permits further violates

the ESA.  *Id.*  Further, the extension of the prospecting permits may affect listed species and/or

critical habitat, and thus the BLM's failure to consult with FWS also violated the ESA.  16

U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14.

142.    The BLM's failure to insure, in consultation with FWS, that the May 1, 2020

Decision is not likely to jeopardize the continued existence of any threatened or endangered

species, or result in the destruction or adverse modification of the critical habitat of such species, violates Section 7 of the ESA.  16 U.S.C. § 1536(a)(2).

143.    The BLM's May 1, 2020 Decision is therefore arbitrary, capricious, contrary to law, and contrary to procedures required by law.  5 U.S.C. § 706.

**CLAIM 6:    The BLM, Forest Service, and FWS are in Violation of the ESA by Failing to Reinitiate and Complete Consultation on the Ongoing Impacts of the Hardrock Minerals Prospecting Permits on the Superior National Forest.**

144.    Plaintiffs hereby incorporate by reference all preceding paragraphs.

145.    The reinitiation of formal consultation is required and must be requested by FWS or the action agency where discretionary federal involvement or control over the action has been retained or is authorized by law, and if a new species is listed or critical habitat designated that may be affected by the identified action.  50 C.F.R. § 402.16(a).

146.    The Forest Service and BLM each retain discretionary federal involvement and control over the Federal Hardrock Minerals Prospecting Permits on the Superior National Forest, as assessed in the 2012 FEIS and 2012 Biological Opinion.

147.    Subsequent to the 2012 Biological Opinion for the Federal Hardrock Minerals Prospecting Permits on the Superior National Forest, wolves in Minnesota have been relisted as a threatened species, with their critical habitat again designated.

148.    Subsequent to the 2012 Biological Opinion for the Federal Hardrock Minerals Prospecting Permits on the Superior National Forest, the northern long-eared bat has been designated as a threatened species.

149.    Gray wolves and their critical habitat, and the northern long-eared bat, may be adversely affected by the Federal Hardrock Minerals Prospecting Permits on the Superior National Forest.

150.    By failing to reinitiate and complete consultation on the Federal Hardrock Minerals Prospecting Permits on the Superior National Forest, the Forest Service, the BLM, and FWS are in ongoing violation of the ESA.  50 C.F.R. § 402.16(a).

151.    As a consequence of failing to reinitiate and complete consultation on the ongoing impacts of the Federal Hardrock Minerals Prospecting Permits on the Superior National Forest, the Forest Service and the BLM are unable to ensure that these prospecting permits are not likely to jeopardize listed species or result in the adverse modification or destruction of critical habitat, in violation of Section 7 of the ESA.  16 U.S.C. § 1536(a)(2).

**CLAIM 7:    The BLM Violated Its Regulations in Issuing the May 1, 2020 Decision.**

152.    Plaintiffs hereby incorporate by reference all preceding paragraphs.

153.    Pursuant to the BLM's regulations, in order to extend a prospecting permit, the BLM must prove that (1) the mining company "explored with reasonable diligence," and was unable to determine the existence and workability of a valuable deposit covered by their permit, or (2) that the permittee's failure to perform diligent prospecting activities was due to conditions beyond their control.  43 C.F.R. § 3505.62(a).

154.    "Reasonable diligence means that, in BLM's opinion, you drilled a sufficient number of holes or performed other comparable prospecting to explore the permit area within the time allowed," or "Your failure to perform diligent prospecting activities was due to conditions beyond your control."  43 C.F.R. § 3505.62(a).

155.    There is no evidence in the May 1, 2020 Decision that for each of the 13 prospecting permits, the BLM required Twin Metals to prove or provide evidence that it had explored with reasonable diligence prior to BLM approving the expansion on the permits, or that

its failure to perform diligent prospecting activities was due to conditions beyond its control. The BLM's approval of the expansions therefore violates this regulation.  43 C.F.R. § 3505.62.

156.    The BLM's May 1, 2020 Decision is therefore arbitrary, capricious, and abuse of discretion, contrary to law, and contrary to procedures required by law.  5 U.S.C. § 706.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully requests that this Court:

A.    Declare that the BLM violated NEPA, Section 7 of the ESA, and the BLM's regulations in issuing the May 1, 2020 Decision;

B.    Vacate the BLM's May 1, 2020 Decision approving the extension of the 13 prospecting permits;

C.    Declare that the Forest Service, BLM and FWS are in ongoing violation of the ESA for failing to reinitiate and complete ESA consultation concerning the ongoing impacts of federal hardrock minerals prospecting permits on the Superior National Forest;

D.    Order the Forest Service, BLM, and FWS to promptly reinitiate and complete ESA consultation on the ongoing impacts of the federal hardrock minerals prospecting permits on the Superior National Forest;

E.    Enjoin all exploratory drilling, land clearing, road work, and any other ground disturbing activities on Twin Metals' prospecting permits pending full compliance with the law;

F.    Award to Plaintiffs their costs, expenses, and reasonable attorney fees pursuant to applicable law including the ESA, 16 U.S.C. § 1540(g) and Equal Access to Justice Act, 28 U.S.C. § 2412; and

G.    Grant the Plaintiffs such further relief as may be just, proper, and equitable.

Dated:  August 5, 2020.    Respectfully submitted,

*/s/ William J. Snape, III*
William J. Snape, III (D.C. Bar No. 455266)
Center for Biological Diversity
1411 K Street N.W., Suite 1300
Washington, D.C. 20005
Phone: 202-274-4443
Email: wsnape@wcl.american.edu
       bsnape@biologicaldiversity.org

Marc D. Fink (MN Bar No. 343407)
Center for Biological Diversity
209 East 7th Street
Duluth, Minnesota 55805
Phone: 218-464-0539
Email: mfink@biologicaldiversity.org
*Applicant Pro Hac Vice*

Allison N. Melton (CO Bar No. 45088)
Center for Biological Diversity
P.O. Box 3024
Crested Butte, CO 81224
Phone: 970-309-2008
Email: amelton@biologicaldiversity.org
*Applicant Pro Hac Vice*

*Attorneys for Plaintiffs*